**In re PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Debtor.**

**Bankruptcy No. 88–00043.**

United States Bankruptcy Court,
D. New Hampshire.

March 22, 1989.

See also, Bkrtcy., 99 B.R. 177.

---

Richard Levin, Martin L. Gross, Concord, N.H., Don Willenburg, Los Angeles, Cal., for Public Service Co.

Joel Zweibel, New York City, J. Michael Deasy, Richard C. Gagliuso, Nashua, N.H., Michael S. Schneider, New York City, for the Unsecured Creditors Committee.

Richard N. Tilton, Howard J. Berman, for the Equity Committee.

Larry M. Smukler, Sr. Asst. Atty. Gen., Concord, N.H., Norman H. Stahl, Mark W. Vaughn, Daniel J. Callaghan, Manchester, N.H., for the State of N.H.

Virginia A. Greiman, Wellesley Hills, Mass., U.S. Trustee.

George J. Wade, Barbara J. Gould, New York City, David J. Dunfey, Hampton, N.H., for Citicorp and Consolidated Utilities & Communications, Inc.

Robert E. Ducharme, for First Fidelity Bank and Amoskeag Bank.

John B. Nolan, Jeffrey G. Grody, Hartford, Conn., for Northeast Utilities Service Co.

Ted A. Berkowitz, John F. Pritchard, New York City, for First Fidelity Bank.

Daniel M. Glosband, Boston, Mass., for United Ulluminating, New England Power, EUA Power Corp., Canal Elec. Co., Connecticut Light & Power Co., and Montaup Elec. Co.

Robert Drain, New York City, for Shearson, Lehman, Hutton, Inc.

John C. Ransmeier, Concord, N.H., for Vermont Public Service Corp.

Jack Lahey, for Business & Indus. Ass'n of New Hampshire.

Victor Bass, Boston, Mass., for Maryland Nat. Bank.

Peter Baylor, Boston, Mass., for Bank of New England.

Robert A. Backus, Manchester, N.H., for Seavoast Anti–Pollution Group, Citizens within the 10–Mile Radius, Campaign for Rate–Payer's Rights.

Nathan M. Fuchs, New York City, for the U.S. S.E.C.

Diane L. Donley, Washington, D.C., for the F.E.R.C. and Nuclear Regulatory Com'n.

## AMENDED MEMORANDUM OPINION ON MOTION FOR SECOND ORDER EXTENDING THE EXCLUSIVITY PERIOD

JAMES E. YACOS, Bankruptcy Judge.

This chapter 11 case is before the court upon the Motion For Second Order Extending The Exclusivity Period filed by Public Service Company of New Hampshire ("PSNH"), dated February 10, 1989 (Court Document No. 1676). The case was originally filed on January 28, 1988 and the original statutory 120–day exclusivity period was extended by court order entered June 22, 1988 for a seven-month period to expire in December 27, 1988. The debtor filed a plan of reorganization on December 27, 1988, and under the terms of the June 22, 1988 extension order was granted a further exclusive period for solicitation of acceptances on its plan to expire on February 28, 1989.

Under the present motion, PSNH seeks an open-ended extension of the exclusive period for solicitation of acceptances of the Plan of Reorganization it filed on December 27, 1988, during which "no party other than [PSNH] may file a plan or solicit acceptances, from February 28, 1989, to

the *later* of 45 days after this Court rules on the § 1123 [preemption] issue embodied in Adversary Proceeding No. 89–08, or 45 days after an examiner, if appointed by this Court, files his report."

Responses to the aforementioned Motion were filed by the Committee of Equity Security Holders (the "Equity Committee"), the Official Committee of Unsecured Creditors (the "Creditors' Committee"), the State of New Hampshire (the "State"), Shearson Lehman Hutton, Inc., beneficial owner of Third Mortgage Bonds issued by PSNH ("Shearson Lehman"), First Fidelity Bank, National Association, New Jersey, on behalf of the Third Mortgage Indenture Trustees ("First Fidelity"), Northeast Utilities Service Company ("NUSCO"), Citicorp and Consolidated Utilities & Communications, Inc., owners of Third Mortgage Bonds ("CCUC"), Bank of New England, N.A., Indenture Trustee for PSNH's General and Refunding Mortgage Bonds ("BNE"), and by Maryland National Bank, N.A., Indenture Trustee for PSNH's First Mortgage Bonds ("MNB").

The Equity Committee supports the debtor's Motion for Second Order Extending the Exclusivity Period. The Equity Committee states several bases for its position, including: That "given the fact that a decision on the preemption issue must be resolved before the Debtor can proceed with the FERC Plan, it would certainly be counterproductive to terminate exclusivity so that other parties can file competing plans"; that "competing plans would likely result in significant litigation and increased administrative expenses for the estate. The cost of these expenses falls directly on shareholders"; that "it is not economical to allow competing plans to be filed with the proviso that the plan proponent is not authorized to seek confirmation of such plan while the preemption issue is [being] resolved"; and that "since the determination of a range of rate levels is a key issue in the negotiations, it is sensible to maintain exclusivity while the examiner prepares his or her report so that the examiner may play a productive role in the negotiations."

The Equity Committee further states that "competing plans will increase the high level of administrative expenses and cause additional delay as each group litigates over each other's plans and disclosure statements and gets bogged down in lengthy and complex discovery relating to each plan and disclosure statement"; that "even assuming that the court terminates exclusivity but holds 'back submission of multiple plans until they [are] merged into a consensual plan, or until it [is] determined that each plan had been improved by competition, '... nothing would be accomplished since for all practical purposes exclusivity would in effect be maintained"; that "the unprecedented issues which are present in this case, including (a) the resolution of the preemption issue, (b) the possibility of the appointment of an examiner, and (c) the hostile actions taken by the State, support continued exclusivity"; and that "the Debtor here is not utilizing the exclusivity extension to pressure creditors to accede to the Debtor's demands.... [Instead] exclusivity is being utilized to maintain a level playing field while this court considers the critical issue regarding federal preemption."

The Creditors' Committee supports a modified continuation of PSNH's exclusivity period. The Creditors' Committee "requests that the Debtor's exclusive right to gain acceptance of the Debtor's Plan be extended to a date thirty days after this Court's decision on the issues raised by the Debtor's Complaint dated February 6, 1989 for a declaratory judgment as to the effect of 11 U.S.C. § 1123 on utility regulation (the 'federal preemption issues'), but only on the condition that both the Creditors' Committee and the [Equity Committee] be authorized now to file plans of reorganization." The Creditors' Committee states several bases for its position, including: That "it is only when a creditors' committee has concluded that a consensual plan is not feasible that the Court should seriously consider terminating exclusivity"; that "the Committee Plan will offer the greatest prospect of being confirmed. The voice of over $1 billion of unsecured claims deserves an opportunity to file its Plan"; and

that "on December 27, 1988, the Debtor filed its Plan without having previously negotiated the terms thereof with the Committee or other parties in interest, or even given a copy thereof to the Committee."

The Creditors' Committee further states that "the Committee Plan is intended to encompass the two most likely outcomes of the case—either a FERC restructuring or Seabrook going into commercial operation, whichever provides the greater value taking into account the likelihood and the timing of the result"; that "in this critical period subsequent to the filing of the Debtor's Plan, a period normally designated for plan negotiations, no effort has been made by the Debtor to address the Committee's concerns and objections, and no negotiation or movement by the Debtor has occurred"; that "because the Committee Plan becomes effective upon either the occurrence of a FERC restructuring *or* Seabrook in service, it faces a much smoother and potentially speedier road to effectiveness after being confirmed than a plan predicated only on a FERC restructuring"; that "in *In re United Press International, Inc.*, 60 B.R. 265 (Bankr.D.C.1986) the bankruptcy court adopted precisely the middle approach to exclusivity suggested by the Committee, selectively modifying exclusivity to allow the creditors' committee to file a plan"; that "that [middle] approach was essentially adopted by Judge Schwartzberg in *In re Texaco, Inc.* (case nos. 87B 20142–20144) in his second exclusivity order dated December 8, 1987"; and that "it is now apparent that the necessary solutions are less likely to come from a Debtor than from another source."

The State opposes the Motion for Second Order Extending the Exclusivity Period. The State states several bases for its position, including: That "the Plan filed on December 27, 1988 was rejected by essentially all constituencies"; that "the Debtor has not been willing to commit to a give and take process and admits in its papers that such negotiations have not occurred"; that "the reason that negotiations have stalled between the State and the Debtor is that the Debtor has determined, on its own, that it cannot negotiate until the section

1123(a)(5) issue is resolved. The State has sought resolution of the section 1123(a)(5) issue because the Debtor has not been willing to negotiate and, because expeditious resolution of bankruptcy issues are in the State's interest, litigation appears to be the only viable path"; that "the Debtor admits that it will not negotiate with the State while the section 1123(a)(5) issue remains outstanding"; and that "the section 1123(a)(5) issue should not immobilize this case especially when it is public knowledge that there are potential plan proposers not inhibited by § 1123."

Shearson Lehman opposes the Motion for Second Order Extending the Exclusivity Period. Shearson Lehman states several bases for its position, including: That "the FERC proposal and the exclusivity Motion are obvious negotiating tactics, which should not be permitted to cause further, protracted delay of these proceedings"; that "from the Governor of New Hampshire, to the New Hampshire Public Utility Commission, to practically every elected State official, to the State's congressional representatives, the State has adamantly opposed the FERC transfer"; that "practical considerations ... such as FERC's willingness to raise rates even assuming it has jurisdiction, the State's ability to depress the value of the substantial portion of PSNH's business that would remain under State jurisdiction after confirmation of the FERC Plan, and the adverse effect on PSNH's reorganization securities caused by uncertainty and inevitable delay over the foregoing issues, also underscore the impracticality of the FERC Plan"; that "it is highly probable that Congress, which expressly intended to protect creditors under section 1121 of the code also would not want a debtor utility to employ exclusivity against the state and rate payers"; that several courts have recognized that "unresolved contingencies do not justify extension of exclusivity"; that "the creditors (accruing interest at the monthly rate of $10 million on unsecured debt and $42 million annually on the third mortgage bonds) should not be subjected to that risk [the "protracted, costly, far-reaching, and po-

tentially unnecessary litigation on the 'section 1123 issue' and the other unique issues raised by the FERC Plan"] and the untoward delay that will result"; and that "expiration of exclusivity will not cause chaos", because, among other things, "the plan deadlock is not as much over creditor distributions (which should be resolvable upon agreement on reasonable rates) as over rate-making and the continuing role of the State."

First Fidelity opposes the Motion for Second Order Extending the Exclusivity Period, and requests the court to immediately terminate exclusivity to permit parties other than PSNH to submit competing plans of reorganization. In support of this position, First Fidelity states that "this case is at an impasse.... [that] relates not such much to distribution issues (how the value available under a plan of reorganization should be divided among the various creditors and interest holders) but to rate issues (what portion of the cost of Seabrook should be borne by PSNH's rate payers as opposed to the Debtor, its creditors and security holders).... [and that] the negotiations on this fundamental issue have stalled, and the parties are becoming mired in litigation that threatens to become intractable." First Fidelity states that "The Third Mortgage Indenture Trustees believe that the solution to the impasse lies in the immediate termination of exclusivity," thereby permitting "parties other than PSNH to submit competing plans of reorganization" and to "negotiate reasonable rates with the State which would support a confirmable plan."

Northeast Utilities Service Company opposes the Motion for Second Order Extending the Exclusivity Period. NUSCO states several bases for its position, including: That "its parent, Northeast Utilities ("NU"), has a solution for the problems of this case. NU can proceed toward that solution now. NU has made a comprehensive written offer to the Debtor and prepared a plan of reorganization.... [that] can and will be filed promptly after exclusivity ends"; and that "the estate's interests are best served by" consideration of "alternate plans ... by the parties to this case" as opposed to "continued relegation of NU and any other credible plan proponents to the sidelines."

CCUC opposes the Motion for Second Order Extending the Exclusivity Period. In support of its position, CCUC contends that the debtor has failed to meet its burden of establishing "cause" for the requested extension pursuant to § 1121(d) of the Bankruptcy Code. CCUC alleges that "PSNH has failed to foster an atmosphere conducive to quick, consensual resolution," that "PSNH has not provided a 'definitive "action plan"' which details the Debtor's realistic prospects for reaching a consensual plan within a definite period." CCUC further states that "extending exclusivity pending resolution of the Section 1123 issue is a waste of time if an acceptable rate plan can be developed with the State," and that "rather than driving the parties away from the bargaining table, as the FERC Plan has done, termination of exclusivity is likely to assist in breaking the current impasse in negotiations and to facilitate resolution of this case." CCUC suggests that this court "can exercise its equitable powers to modify exclusivity and grant a limited number of parties, including the Third Mortgage Bondholders, the concurrent right to file a plan."

CCUC contends further that "the Debtor attempts to obfuscate [the standards for extension of the exclusivity period] by arguing that extensions, even those as open-ended as the one currently requested, should be allowed if the eventual achievement of a consensual plan as a 'realistic possibility'. Indeed, far from a consensual plan being 'imminent,' the actions of the Debtor have resulted in polarization of the many interests in this case." CCUC notes that "there will always be a 'realistic possibility' of an eventual consensual plan if one party can control the process indefinitely until, in total frustration, the others eventually yield to its demands." CCUC states that "with the Debtor readily admitting that its negotiations with the State have reached an 'apparent impasse', no consensual plan is imminent with the Debtor in control. Finally, CCUC contends that "the

creditors of PSNH are best served by a denial of the motion to extend exclusivity further, [because] bringing an end to exclusivity and permitting the submission of competing plans would not necessarily preclude, and would probably facilitate, the ultimate adoption of a consensual plan of reorganization.... [and because] further delay would be especially unfair to the Third Mortgage Bondholders who are not presently being paid interest on their investments, which is accruing at an annual rate of approximately $42 million."

The Bank of New England supports a modified extension of the exclusivity period, and "proposes to tie termination of exclusivity to ... the Debtor's decision as to whether it will proceed with the [FERC Plan] or propound a different plan premised on acceptance of one or another of the submitted or anticipated acquisition bids." BNE states that it "does not seek an abrupt end to exclusivity. It does, however, urgently want to maintain the salutary tension between the 'merger and acquisition' and the 'internal restructuring' alternatives." BNE believes this can be fostered without undue delay or prejudice and that "in the meantime, ... the Court should defer any hearing on any disclosure statement the Debtor may file with respect to the [FERC Plan]."

The Maryland National Bank supports a modified extension of the exclusivity period, although it suggests a shorter and more certain extension than that proposed by the Debtor. MNB suggests that "termination of exclusivity be tied to the Debtor's receipt of bids, rather than to the resolution of the § 1123(a)(5) issues or the report of an examiner, and thus proposes that the termination date be set on a date certain in the month of April." MNB states that this time period "would give the Debtor sufficient time to assess acquisition proposals and make a determination whether it will file a sale plan, or proceed with the [FERC Plan] or other internal restructuring plans. If, prior to the April termination date, the Debtor determines to propose a sale plan, [MNB] would support a further reasonable extension of the exclusivity period to allow the Debtor to assemble a consensual plan."

However, MNB states that "if the Debtor rejects the bids offered ... the time may well be at hand then for interested parties to be given the opportunity to present competing plans that may be more beneficial to creditors than the Debtor's proposed plan." Finally, MNB concludes that "setting a firm date in April for termination of the exclusivity period has the benefits of (i) allowing the Debtor sufficient time to evaluate the bids it receives by March 31, (ii) linking the exclusivity period to the Debtor's stated timetable for assessing its options, and (iii) providing creditors and the Court the opportunity to revisit the exclusivity issue in light of available alternatives immediately after the Debtor makes clear its choice between acquisition plans and internal restructuring."

## THE HEARINGS

This court held hearings regarding the Debtor's Motion for Second Order Extending Exclusivity Period on February 22, February 23, February 24, February 28, and March 1, 1989. During these hearings, the court considered the testimony of Mr. Steven Davis, the leader of the negotiating team for CUC and Citicorp, Mr. Robert Busch, Vice President of Northeast Utilities Service Company, Mr. Charles E. Bayless, Senior Vice President and Chief Financial Officer of PSNH and officer in charge of PSNH's reorganization, Mr. Martin L. Gross, local counsel for PSNH, and Mr. Roger Taylor, a Director at Salomon Brothers, Inc., which is the financial advisor for the Creditors' Committee.

During the course of the hearings the court also received various items of documentary evidence in support and in opposition to the Debtor's motion. Certain of the exhibits, dealing with the detailed specifics of various rate proposals and analysis of same, which had not already been publicly disclosed, were sealed by agreement of all parties present that public disclosure at this time would be detrimental and counterproductive to any ongoing negotiations attempting to achieve a consensual plan in this case. Accordingly, the court's discussion of these items must necessarily be

equally guarded. Where such items are involved, this opinion will discuss the same in general terms sufficient for present purposes—avoiding any unnecessary specificity and preserving the intent and agreement of the parties that the exhibits themselves remain sealed.

[The transcripts of the hearings are numbered in Roman numerals I through IV; for brevity transcript references in this opinion will give only the Roman numeral for the transcript volume and the page numbers therein.]

## GENERAL BACKGROUND

As indicated, the debtor filed its chapter 11 petition in this court on January 28, 1988. At that time, the books and records of the debtor were up to date with none of the usual questions concerning assets and liabilities in a corporate reorganization proceeding. The essential problem precipitating the chapter 11 filing was the completion of the Seabrook nuclear plant in 1986 with full licensing delayed by various administrative and litigation obstacles. See *In re PSNH*, 88 B.R. 521 (Bankr.D.N.H. 1988). At the outset of the case there also were no charges of fraud or mismanagement involving the company which required any investigation. Indeed, all parties agree that the debtor in its basic electrical service operation is well managed and efficient, positioned fortuitously in an area with an increasing market demand for electricity, and that but for the regulatory delay attendant to bringing the Seabrook nuclear plant on line would not have required chapter 11 relief.

It was apparent from the outset to company officials, as well as all other parties in the case, that *rate levels* for the reorganized company would be the most important factor to be resolved in the reorganization. The determination of the fate of the Seabrook nuclear plant—while important—was largely a determination involving public health and safety issues which were to be determined in other forums. It was also apparent to the Debtor from its own "elasticity studies" that there was a maximum level above which electric service rates could not be raised, regardless of what theoretical increased rates might be justified from a legal standpoint when the costs of the Seabrook nuclear plant could be added into the Debtor's rate base.

Following the chapter 11 filing, within approximately a month, an expression of interest in acquiring the debtor by another utility system was expressed by New England Electrical System ("NEES") based in Massachusetts. NEES signed a confidentiality agreement with the debtor and was given access to certain financial and operating data by the debtor. While NEES has made some public pronouncements as to an interest in making a bid for PSNH it has to date taken no concrete actions to that end.

In March of 1988 another approach by a potential acquirer was made by Northeast Utilities ("NU") based in Connecticut. The debtor's representatives and NU met in May of 1988 to discuss access to data regarding the debtor. An issue arose as to the confidentiality agreement that the debtor required NU to sign before giving access to the data. On June 24, 1988 the debtor advised NU that it was ready to provide the documentation identified by NU but would require execution of a fairly stringent confidentiality agreement. A representative of the debtor also indicated to NU that the process of negotiating possible plans of reorganization involving acquisition by an outside party would take a considerable period of time. The debtor would create a "process" for dealing with bidders interested in acquiring the company and would determine a deadline within which to entertain such bids as might be appropriate in conjunction with its formulation of a plan of reorganization. It was represented to NU that the bid process would take approximately three months and that the deadline for receiving bids would probably be in September. [Tr. II–23]

Also in May of 1988 Governor John Sununu of the State of New Hampshire had announced his decision not to run for re-election to the governorship in the fall elections. In discussions between representatives of the Debtor and the State of New

Hampshire Larry M. Smukler, attorney for the State pointed out that the best opportunity to obtain definitive negotiations and a settlement on rate levels would be prior to the expiration of Governor Sununu's term of office on January 5, 1989. Smukler referred to this time period as a "window of opportunity for negotiation" since no one knew who the next governor was going to be and it would be better to negotiate with someone in office who had an established track record of strong support with regard to the bringing of the Seabrook Nuclear Plant into operation. [Tr. IV–16] The company itself recognized that it would be "politically safer" to try to negotiate a settlement with regard to rate levels with Governor Sununu. before he left office. [TR. II–280] Thus was born the famous, or infamous, reference to a "window of opportunity" that became a recurring theme in the further progress of the case.

During the foregoing discussion, the Debtor's chief regulatory attorney, Mr. Gross, specifically inquired whether the State would be "stuck" on rate level increases limited to cost of living index inflation figures. The reason for this inquiry was that Governor Sununu had on a number of occasions indicated his view that PSNH could remain viable and absorb the necessary portion of Seabrook costs with rate increases limited to the rate of inflation. Smukler's response indicated some flexibility away from inflation rate increases. [Tr. IV–19] [See also Tr. II–254 et seq. for further details]

On June 7, 1988 this court denied a Motion by the Debtor for employment of the First Boston Corporation for merger and acquisition services—with the order of denial being entered "without prejudice". [Court Document No. 876] In the findings and conclusions supporting the Order the court noted:

> This motion is denied without prejudice to a new motion to be filed after there's been a general discussion between the debtor-in-possession and its investment banker and the committees and their investment bankers and any other qualified negotiating parties as to the various options available to this company. *I say*

> *general discussion—I don't mean that to be the last discussion.* (Emphasis supplied)

> \*   \*   \*   \*   \*   \*

> I think we have, when the advice has been given as to possible options—the general advice—and there's an open period there in which the debtor can make its determination along with consulting with the other negotiating parties as to which direction they think they ought to go, at some stage after that first general discussion it may well be appropriate to appoint this investment banker or some other investment banker to pursue a sale option or at least a further development of sale options.

## THE NEGOTIATIONS—JUNE 22 TO DECEMBER 27, 1988

On June 22, 1988, the court entered an order granting a seven month extension of the exclusivity period specified in § 1121 of the Bankruptcy Code. See *In re PSNH*, 88 B.R. 521 (Bankr.D.N.H.1988). In that decision, the court examined in considerable detail the appropriate standards and factors to be evaluated in determining an extension of the statutory period for exclusivity and debtor plan formulation and acceptance. In the course of reaching its decision, the court noted as follows:

> It seems clear from a review of the relevant authorities that size and complexity alone cannot suffice as "cause" for a continuation of a Debtor's plan exclusivity right in a chapter 11 reorganization. If that were so, a debtor in a case such as the present would automatically have a right to plan exclusivity throughout the proceedings—contrary to the "balancing" and "tension" rationale underlying § 1121 as detailed above.

> \*   \*   \*   \*   \*   \*

> The court concludes that an appropriate interpretation of the "for cause" language of § 1121(d) would provide that size and complexity must be accompanied by other factors pertinent to the particular debtor and its reorganization to justify extension of plan exclusivity, except

perhaps in the very early, initial stages of the chapter 11 proceeding. Such factors include those developed in the cases, i.e., the likelihood of an imminent consensual plan if the debtor retains control, no alternate substantial plan being held off by debtor exclusivity, and the general balancing analysis to avoid allowing the debtor to hold the creditors and other parties in interest "hostage" so that the debtor can force its view of an appropriate plan upon the other parties.

\* \* \* \* \* \*

From the entire record before me it would appear that there is a "window of opportunity" of approximately six months in which a relatively painless reorganization plan might be negotiated on a consensual basis. While the questions are complex and many, the professionals approved by the court in this case should be able to do the job. As for the timing of the extension date I also take into account the quadrennial event scheduled to occur on November 8, 1988. [88 B.R. at 537]

The reference to the general election on November 8, 1988 took into account that the candidates for election as President had taken strong positions for and against the bringing of the Seabrook nuclear plant on line. It was also generally recognized that Governor Sununu had been a strong supporter of the Seabrook plant throughout his tenure as Governor of the State.

On July 8, 1988 the debtor's then Chief Executive Officer, R.J. Harrison wrote to Governor Sununu suggesting a general meeting with the State and the various constituencies represented in the reorganization proceedings. The meeting was to lay the ground work for the hopeful achievement of a consensual plan of reorganization. The company also suggested that representatives of the legislative leadership also be present. The letter to the governor suggesting the general meeting also commented:

We should also discuss timing. As you know, Bankruptcy Judge Yacos has extended the time in which only PSNH may file a reorganization plan with the court only through December 27. While we believe that further extensions may reasonably be expected, I would like to accomplish as much as we can toward an agreement by that date. Thus, I will be prepared at the meeting to suggest a schedule and timetable for future negotiations.

As a result of the debtor's letter a general meeting was scheduled and held in the Governor's offices on August 2, 1988. Earlier, on July 13, 1988, the Creditors' Committee submitted a rate level proposal on its own behalf to the State representatives, accompanied by financial runs of supporting projections and documentations.

### August 2, 1988

At the general meeting on August 2, 1988 the debtor's representatives appeared accompanied by the representatives of the unsecured Creditors' Committee and the Equity Committee, together with their respective financial advisors and other supporting personnel. Present besides the Governor were the Speaker of the New Hampshire House of Representatives and the President of the New Hampshire Senate.

The debtor distributed at the August 2nd meeting a one-page sheet of "Reorganization Plan Goals" listing the factors it considered material to any plan of reorganization. The Governor responded by inquiring as to what "scenario" the debtor proposed to follow in achieving its plan. After some discussion about a possible resort to transfer to FERC (Federal Energy Regulatory Commission) jurisdiction the Governor indicated forcefully that the State would never agree to a transfer of the reorganized company away from State regulatory control. He also indicated his strong view that there was no way the Seabrook plant would not ultimately go on line and produce electricity for users in New Hampshire.

The Governor expressed some irritation that the representatives of the debtor, the committees and the State had not been able to reach a rate level agreement in the six months since the chapter 11 filing. He reacted somewhat sarcastically to the Debt-

or's argument that there should be a "value-oriented goal for resolving the problems" as opposed to the Governor's desire to focus immediately and definitively on rate levels. He assured the parties present that he would cause a special session of the legislature to be convened to enact the necessary amending legislation once a deal on rates was accomplished.

The debtor inquired of the Governor at the August 2nd meeting whether he was in effect wedded to "rate of inflation" with regard to any rate increases that might be negotiated, in view of his prior public pronouncements. The Governor responded that the cost of living index was enough in his view, but that it was not the rate but the "rate of the rate" that was important. He noted that it is "not where you end up but how you get there" that mattered.

At the outset of the August 2, 1988 meeting Governor Sununu stated that he "wanted to be blunt" and he was. But underneath the bluntness it is apparent that the Governor was seriously making the point that he could not get public acceptance for "front-end loaded rate increases" and thus it was quite important from his perspective as to just how any total agreed rate increases would be phased-in after the reorganization. It is clear from the entire record that the State consistently has taken the position that no rate of increase in any one year should be in double digits.

At the conclusion of the August 2, 1988 meeting, it was not made clear which party would come forward with any further rate level proposals. The Governor indicated he did not understand the debtor wanted the State to go first—but there was no response before the conclusion of the meeting.

[See generally Tr. IV, pp. 22–34, re August 2, 1988 meeting.]

### September 15, 1988

In the absence of any rate level proposals emanating from the debtor, following the August 2, 1988 meeting, the State came forward with a rate increase proposal of 4 percent per year over September 1, 1988 levels for a period of five years. This proposal was presented in a rate term sheet at a meeting of attorneys representing the various parties on September 15, 1988. The State had requested the meeting several days before.

Only lawyers were present at the September 15, 1988 meeting. The State's representatives at the September 15th meeting indicated that the rate "percentages" were at the top of their negotiating position but that the "revenue effects" achievable by other means in the regulatory approvals of the debtor's rate base and other factors *were* negotiable. The debtor at the outset of the case had indicated it needed a total of 40 percent in rate level increases. While it agreed that the rate increases might be phased in over a period of years, it took the position that if it could not have a "bullet" one-time increase of 40 percent the phased-in increases over a period of years would have to be present valued back to achieve a present worth of 40 percent, i.e., the total rate increases would have to be *over* 40 percent during the period of phase-in involved.

The State's rate level offer of September 15, 1988 had a "regulatory lock-out" feature that in effect meant that the debtor would get the 4 percent yearly rate increases regardless of whether energy costs went up or down.[1] It was also contemplated by the State under its offer that at the end of the five-year rate increase period some device would be installed to preserve those increases from subsequent deduction, i.e., there would be an agreed increase in the rate base level to preserve the agreed five-year increases from diminution. This latter feature was the first broaching of the "regulatory asset" device to allow the debtor to hold onto the agreed rate increases and to serve as a device for the potential sharing of cost savings when Seabrook started to operate.

Separately, at the end of September, the Debtor advised Northeast Utilities that the

---

1. The ECRM (Energy Cost Recovery Mechanism) device otherwise would have automatically raised or lowered the debtor's rate levels in reaction to any changes in actual costs of fuel, etc.

offering memorandums that First Boston was working on would take more time and that the date for accepting bids would be in early 1989.[1a] [Tr. II–33]

[See generally Tr. II, pp. 260–261; Tr. III, p. 81; Tr. IV, pp. 14, 35–53, 134; re September 15, 1988 meeting.]

### October 13, 1988

Following the September 15, 1988 meeting, neither the debtor nor the committees gave any counterproposal to the State with regard to rate levels. The Debtor also did not make any inquiry of the State with regard to the underlying data or specifics supporting the State's rate sheet proposal.[2] Instead, a further meeting was convened on October 13, 1988 at which a representative of the financial advisor to the unsecured Creditors' Committee gave an analysis and critique of the State's proposal on behalf of both committees and the debtor.

The State's September 15th rate level offer was rejected. No counterproposal on rates was provided at the October 13th meeting by the debtor or the committees. Smukler indicated that the State would review the critical comments and get back to the debtor and the committees. Smukler specifically indicated at the conclusion of the meeting that the State "would be receptive, to other ways . . . ." of structuring the rate increase.[3]

### November 18, 1988

A further meeting was held between the Debtor and the State representatives on November 18, 1988. While the meeting was originally called to discuss certain developments regarding the activities of the joint owners of the Seabrook nuclear plant, the State and debtor representatives got into a further rate level discussion. Smukler noted that they had not yet received any counterproposals and Gross inquired as to whether a counterproposal "would be worth making" if it involved higher rates than those included in the State's September 15th proposal. Smukler responded that "we didn't say there was no room for adjustment" (with reference to the September 15th meeting) and added "there are a lot of things we can do." The State reiterated its opposition to any attempt to transfer regulatory jurisdiction to federal agencies and noted that "a FERC plan would be counterproductive" to further negotiations. At the conclusion of the meeting the State representatives again inquired as to whether and when they would see a counterproposal by the debtor on rate levels.

On November 21, 1988 the debtor advised the State that the Debtor would submit a counterproposal in early December. Gross noted however that the ECRM (Energy Costs Recovery Mechanism) was changing constantly, i.e., adjusting rate levels automatically with regard to changing energy costs, so that discussions of rate increases and percentage terms were not "stable" inasmuch as the approaching year-end ECRM adjustment would very likely push rates downward.[4] On November 22, 1988 Smukler called back and indicated

---

**1a.** Subsequently, at the beginning of January 1989, the Debtor advised Northeast Utilities that the date for accepting bids would be February 1, 1989. After NU went public with its offer on January 12, 1989, the Debtor's financial advisor first indicated they would proceed with the NU bid but then modified this response to indicate that no bids would be evaluated until March 31, 1989. [Tr. II–33]

**2.** This was unfortunate. As will be developed later, there was a basic ambiguity in discussing percentage rate increases in terms of "base rates" but also basing the calculation upon the "total rates" in effect as of September 1, 1988. [Tr. IV, pp. 41–53] Had there been some probing of what turned out to be a misunderstanding in the minds of Gross and Smukler as to the

"larger denominator" that Gross was assuming under the State's offer, that discussion and negotiation could have been done in October rather than in December.

**3.** In effect this sequence with regard to the September and October meetings left the State in a position of "bidding against itself" as noted by the State's representative during the hearings before me on the exclusivity extension.

**4.** Gross in his testimony states that during the November 21, 1988 phone conversation he told Smukler that the Debtor's counterproposal would incorporate "the logic of their proposal [the September 15, 1988 offer] that is rate increases calculated on the present existing revenue base including ECRM revenues in order to

that the State would support a delay in the ECRM adjustment beyond year-end if the State could get a counterproposal on rate levels from the debtor.

[See generally Tr. IV, pp. 47–52, re November 18–22, 1988 discussions.]

### December 2–15, 1988

On Friday, December 2, 1988, the debtor delivered to the State a one-page term sheet on proposed rate levels for the reorganized company. This proposal included a "bullet" one-time rate percentage increase of 25.3 percent, together with various other features effecting pass through of costs through the ECRM mechanism. It also included a "regulatory mechanism" to preserve the retail revenue as of December 31, 1988 and to produce the one-time 25.3 percent increase applied to that level of revenue. The term sheet specifically included a provision for the Debtor to retain any energy cost savings from the operation of the Seabrook nuclear plant once it went on line.[4a] Later that Friday, Smukler called Gross and indicated his belief that the Debtor and State proposals were not too far apart.

However, on Monday, December 5, 1988, Smukler advised Gross that his earlier "optimism" was tempered by a further reading and analysis of the December 2nd term sheet, including various features not directly covered by the percentage rate increase. He had "a lot of questions." In effect, Smukler now realized there had been some miscommunication between the Debtor and the State in the prior negotiations as to whether the rate increase percentage would be applied against the *base rate* revenues of $320,000,000.00 of the Debtor,

or against the *total* revenues of $525,000,000.00 of the Debtor. The difference in effect was the difference between $81,000,000.00 and $133,000,000.00 of revenue increase in applying the 25.3 percent factor.

On December 7, 1988, Smukler called Gross and stated that a 25 percent increase in base rates might be negotiated if the parties could agree on the concept of some "discounting" of the total revenue increase under the Debtor's proposal to achieve a present value agreement rather than the lesser value incident to the delay of two or three years of litigation. Smukler indicated the State's desire to reach an appropriate middle ground between the parties for a quick settlement.

Smukler also indicated during the December 7th phone conference that the State was concerned about the looming December 27, 1988 expiration of debtor exclusivity that might prompt the filing of the FERC plan in the absence of a consensual agreement. The State would treat such a filing as a "declaration of war" under which the State's representatives could not even count upon the present Governor or the incoming governor, Judd Gregg, as "being at the table" in the event of such a filing. Smukler stated that the State would agree to an extension of debtor's exclusivity to mid-January, to avoid the possibility of a FERC plan filing, if the Debtor and State were still negotiating on rate levels.

Earlier, on December 6, 1988, the debtor had a meeting with the committees and CCUC at which it distributed an outline term sheet for the plan of reorganization it intended to file. This was the debtor's "FERC Plan" and this meeting was the

---

capture a larger denominator." [Tr. IV, p. 53] Gross testified further that Smukler confirmed that this had been "the logic" underlying their prior proposal. That may have been Gross' impression, but upon the entire record, as will developed later, it is apparent to the court that Smukler was only focusing on the ECRM problem and not the larger question. Again, had the debtor responded with a counterproposal in *dollars* rather than in general verbal references to the *logic* underlying various proposals this discrepancy would have been earlier discovered in the negotiations.

4a. It was argued during the hearings that the total revenue effect of Debtor's December 2, 1988 rate proposal (and the essentially identical provisions included in its December 27, 1988 filed plan of reorganization) was in fact a 40 percent one-time increase in base rates assuming other factors remain constant. The point argued was that the Debtor had started out the chapter 11 proceedings demanding 40 percent in rate increases and really hadn't backed off substantially since. However, the record is inconclusive on this point. [See Tr. IV—176–186]

first time that its plan was "put on the table" for the committees and CCUC in the sense of an "actual plan"—albeit in draft outline form. There had been informal discussions between the parties before with rough term sheets but no draft "plan" as such. Bayless indicated that the draft plan included "strictly an opening position" with regard to distribution features as to CCUC and the committees and that the debtor "would not file a disclosure statement for this because we wanted to continue to negotiate" as to those distributive features after the December 27, 1988 plan filing. [Tr. II, pp. 203] With regard to the FERC option as to regulatory treatment, and the rate levels proposed, Bayless indicated that it was pretty well committed to the FERC option in order to be able to file a plan by December 27, 1988 and that the rate levels were "pretty close to the bottom line" that the debtor could agree to with the State. [Tr. II, p. 265]

CCUC's draft plan was not circulated at the December 6, 1988 meeting but the principles underlying its proposed plan of reorganization were communicated early in December to those parties. Earlier, on November 22, 1988 the Debtor had invited Northeast Utilities to make a presentation to the Debtor's management with regard to Northeast Utilities' proposed plan of reorganization. Northeast Utilities did not make that presentation but instead on December 7, 1988 noted that when it finally got access to the data room, after signing the confidentiality agreement in November, certain of the documents and data sheets originally noted to be in the data room in the Spring of 1988 were no longer there.[5]

During the period of December 9 through December 12, 1988 Smukler and Gross had a number of phone conversations regarding the parties' positions and agreed that a further negotiating session on rate levels was appropriate. They both agreed that if they were going to "do a deal" the principals as well as the professionals should be present. Accordingly, a tentative meeting for December 15, 1988

was scheduled which would include the Debtor, the Committees, the State, and their assorted lawyers, financial advisors and accountants. On December 12, 1988 Smukler called Gross and indicated that Governor Sununu also wanted to be at the meeting in order to "make an all-out push for a resolution" and asked that the meeting date be changed to December 17, 1988 and the place be changed to the Governor's office. Gross responded on December 13, 1988 objecting to the change in meeting place but agreed to the changed date to Saturday, December 17, 1988. The Debtor and the State agreed that the meeting would be in Manchester at the law offices of the State's outside counsel for the reorganization proceedings. It was also agreed that the professionals would have their own preliminary meeting on December 16, 1988.

The State's representatives advised the Debtor on December 14, 1988 that they could not tell the debtor or other parties what the State's exact position would be at the December 17, 1988 meeting because "it was tough to catch up with Governor Sununu" due to his constant shuttling back and forth between New Hampshire and Washington, DC, under his impending appointment as Chief of Staff for the new President of the United States. [Tr. IV–87] During the earlier conversations between Smukler and Gross with regard to the new negotiating session, Smukler told Gross that the State's representatives "weren't stuck with [the September 15, 1988] number and if they were able to negotiate a deal at a higher number, that the governor-elect would support it." [Tr. IV, p. 76] Gross in turn gave his commitment to Smukler that the Debtor would make every effort to move from their December 2, 1988 number toward the State's number. [Tr. IV–143]

[See generally Tr. I, p. 13; II, pp. 199, 203, 265; III–pp. 83–84, 128–29; IV–pp. 57–65, 66–67, 74–77, 82–84, 87, 143, 158–59, 212–13 re the December 2–15, 1988 period]

---

**5.** A representative of the debtor testified that certain competitively-sensitive documents were in fact removed from the data room, to restrict access to the same by outside bidders, although they did remain available to the negotiating committees and other parties in interest.

*December 16, 1988*

At the preliminary meeting on December 16th Smukler advised that representatives of the Senate President and the Speaker of the House of Representatives would be present at the meeting the next day, as requested by the Debtor, together with representatives of Governor–Elect Gregg. He further advised that Governor Sununu had committed an entire day to the meeting, and that the object was to get a deal done on rate levels if at all possible. Smukler also indicated that a concept involving a different "regulatory asset" to be added to the PSNH rate base (and thus cause indirectly additional increases in rate revenues) would be presented at the December 17th meeting in addition to the "plain vanilla" rate increases in simple percentage terms. The "regulatory asset" was indicated as a flexible device to increase revenues without directly adjusting the specific percentage of rate increases. The representatives of the Debtor understood at the December 16, 1988 meeting that the new proposal would be substantially different in structure from either the September 15 or December 2 terms sheets on rate increases.

During the course of the December 16, 1988 meeting Smukler indicated some concern on the State's part as to whether the Debtor was willing to move from the rates included in the December 2, 1988 term sheet. Gross responded that the company was ready to move for a quick settlement and it was left for the State to make a new proposal—a counterproposal to the December 2, 1988 term sheet of the debtor—at the negotiating meeting the next day. Bayless was at the December 16, 1988 meeting and observed that methodology was not necessarily important—that it was the result that counted. Donald E. Dietz III, a representative of the Debtor's financial advisor, The First Boston Corporation, added that there had to be an important agenda for the December 17, 1988 meeting.

The parties present at the December 16, 1988 meeting did in fact discuss in more detail the specifics of the up-coming new State proposal but the court honored their request at the hearings that further testimony as to those details not be elicited and become a part of the public record—to avoid detrimental effects upon any future bargaining sessions between the parties.

Earlier on December 16, 1988, and separately, the State had met with representatives of the Creditors' Committee and received a counterproposal by the Creditors' Committee to the rate level offer made by the State at the September 15, 1988 meeting.

[See generally Tr. I–p. 148; II–p. 268; IV–pp. 88–92 re December 16, 1988 period]

*December 17, 1988*

On the morning of December 17, 1988, before the general meeting commenced, the professionals involved with the Debtor, the Committees, and CCUC met at a breakfast meeting to discuss the upcoming conference. It was suggested by some of the participants at this conference that the best response to the State's new proposal would be to "study" and "analyze" the proposal *after* the meeting but not attempt to respond or agree to anything *at* the meeting. Those participants were described by Mr. Gross as not "really interested in listening to the [State's proposal] at all." [Tr. IV–204] The identity of "those participants" is unclear from the record.

The general meeting was convened at 10:30 a.m. in the law firm offices with some 50 persons in attendance, including representatives of the various "principals" as indicated above, together with various professional attorneys, accountants, and investment banker personnel. Representatives of the New Hampshire legislative leaders and the incoming governor-elect were also present.[6]

---

6. The meeting was held in a very large atrium-styled conference room in the law offices familiarly referred to by some of the attorneys as the "Cave of the Winds" because of its towering ceiling and alleged wind currents. The court gives no weight in this decision to the meeting place or the alleged excessive wind currents encountered therein. Suffice it to say that there were plenty of "windows" available at the meeting to deal with the wind currents if the parties so chose.

At the commencement of the meeting Norman H. Stahl as outside attorney for the State indicated that "this is a settlement conference" and introduced Governor Sununu to the meeting. The Governor indicated his view that the "window of opportunity" was closing fast and that the parties should use it to advantage. The governor indicated that he could take the "heat" from the public and the legislature in reaction to any rate increases and could get any rate level increases accomplished before he left office.

After giving a brief general summary of the State's new rate level proposal Governor Sununu indicated he would turn the meeting over to Smukler to fill out the details of the new proposal. Before doing so, however, he stated further that he would have to leave by 4 p.m. and that if no deal could be achieved on rates he might make a public announcement of the "greed" of the various parties to the press and might further withdraw the State's evacuation plan approval with regard to the Seabrook plant.

Smukler then circulated a one-page term sheet for the State's rate level proposal—a proposal basically providing for increase in rate levels through the "regulatory asset" device with the increases phased into the rate base over a specific time period comprising some five years. This new proposal avoided both the "bullet" or "phased-in percentage" rate increase features of the earlier term sheets. The new State proposal also provided for "no regulatory lock-out" to address the concerns the debtor had expressed with regard to that feature of the September 15, 1988 offer by the State, i.e., that regulatory lock-out would prevent the debtor from receiving *higher* rates than the agreed percentage increases in the event of escalating energy costs.

The Debtor's representatives at the December 17, 1988 meeting now indicated a new concern, i.e., that the new State proposal, because of the lack of a regulatory lock-out, could in effect result in *lower* rates than was included in the State's original September 15 proposal in the event of decreasing energy costs and the continuing volatile nature of such costs. The Debtor also noted concern over the simple politics of rate hearings before the PUC. The governor asked how the State "could fix that" and after some discussion indicated that "we could make it so that rates would not fall below a fixed percentage."

Following the general discussion of the State's proposal during the morning the various parties broke off into separate discussion groups in other rooms of the law firm offices. They continued their discussions during lunch and reconvened at approximately at 2:30 p.m. in the general conference room. At that time, James D. Neidhart, the chairman of the creditors' committee, speaking for both committees and the debtor, stated that while the parties noted "constructive elements" in the State's new proposal they needed further time to study it; that they could not evaluate the proposal right then; and they would get back to the governor "as soon as possible." The governor responded as to what was meant by "as soon as possible" and inquired as to whether that meant "hours, days, weeks, months" or what specific period. The response to the governor was simply the rote repetition of the "as soon as possible" mantra agreed upon by the debtor and the committees. The governor finally responded that "you want me to drop dead" and noted that if there was to be any settlement on rate levels it had to be in a matter of *days* if he was to act and implement it on behalf of the State and the various agencies and other public bodies involved.[7]

---

7. Gross in his testimony paints a different picture of the remarks by Niedhart and Governor Sununu at this point in the December 17th meeting. He indicates that the governor was given a response of "a week" in response to the governor's question as to when he might expect a counterproposal. Gross further indicates that the governor's immediate response was the

"drop dead" comment cited above. Gross testified from notes taken during the meeting and in my opinion did not have as fresh a recollection of this colloquy as the other witnesses. Accordingly, I find more credible the remarks and sequence described in the text. Indeed, the governor's "drop dead" retort only makes sense in the context and sequence described above. [As

Governor Sununu left the building approximately an hour later but the other parties continued for a half an hour or so to discuss the State's proposal further. Stahl and Neidhart engaged in a discussion in which Stahl asked Neidhart to try to get a counterproposal to the State by Monday, December 19, 1988. Niedhart said it would be "done as soon as possible" but he could not promise Monday.[8]

When the general meeting finally broke up at approximately 4:00 p.m. there had been no counterproposal by the debtor or the committees to the State's new proposal and no indication of any specific time within which any counterproposal might be forthcoming.

The State on Monday, December 19, 1988, filed a motion seeking to have this court intervene by virtue of an immediate "status conference" hearing to attempt to break up the apparent impasse in negotiations. This court on the same date without hearing denied that request by court order. The court noted in declining the State's request that:

> This court has previously indicated that the debtor should have the full benefit of the "exclusivity period" in plan formulation intended by the statutory provision in § 1121 of the Bankruptcy Code and this court's orders entered thereunder. See *In re PSNH*, 88 B.R. 521, 524 (Bankr.N.H.1988). The court has also indicated that its role is appropriately limited in plan formulation issues prior to the formal hearings required once one or more plans are filed under the provisions of chapter 11 of the Bankruptcy Code. See *In re PSNH*, 88 B.R. 521, 539, 545 (Bankr.N.H.1988).

> To grant the present motion would necessarily, in my judgment, improperly intrude the court into the plan formulation process prior to the expiration of the debtor's exclusivity period intended by

the Japanese film *Roshomon* teaches us, the eyewitnesses to any event often have sincere but quite different views of the event depending upon their position and motivation.]

**8.** During the December 17, 1988 meeting, the representatives of Governor–Elect Gregg stated

Congress. The motion therefore is denied.

\*   \*   \*   \*   \*   \*

The court by today's action does not in any way want to dissuade the parties from continuing a maximum effort to reach a consensual plan if at all possible. Indeed, it is in part to avoid deflecting them from that task that I decline to enter into the process at this stage of the case. It surely should be evident to anyone who has attended the hearings to date that notwithstanding the natural proclivity of an advocate or litigant to see their preferred option as the "only" one that is "feasible" and "supported" by "law" there is a great deal of legal quicksand underlying *all* such absolutist positions in this case. A wise compromise by knowledgeable professionals is much to be preferred, if achievable, in view of the substantial administrative costs and loss of other economic values that will be incurred by any further delay in concluding these proceedings. [Court Document No. 1497]

Also on December 19, 1988 CCUC had prepared an "updated analysis" of its own draft plan and a modified version of the State's December 17, 1988 offer trying to bring the two proposals closer together. CCUC in fact during the December 17, 1988 meeting, over the lunch hour, had computed the rough increase in enterprise value under the State's proposal using a laptop computer, and had urged the other parties to come up with a counterproposal for modifying the State's rate level offer. [Tr. I—146–47] Over the weekend, CCUC had its financial and rate consultant prepared the analysis referred to above as a step in trying to bring the parties closer to a middle ground on rate levels. CCUC submitted its revised analysis to the State on December 19, 1988. [Tr. I—101–102]

that the governor-elect would support any consensual plan negotiated by Governor Sununu. The legislative representatives also indicated that they would undertake the enactment of necessary legislation if a consensual plan could be negotiated.

Also on Monday, December 19, 1988, Smukler told Gross that the offer made by the State on December 17, 1988 was *not* the State's last and best offer; that the incoming governor might not be able to offer anything more than that; and reaffirmed that the State would be agreeable to an extension of exclusivity into mid-January of 1989. [Tr. IV–119]

On December 22, 1988, the Creditors' Committee responded to the State's December 17, 1988 rate level proposal with its own counterproposal using the Committee's same basic proposal of December 16, 1988 but "levelizing" the total rate increases, i.e., switching from levelized increases in total rates to levelized increases in base rates to change the timing of rate impact on customers. However, in the Committee's valuation analysis comparing the Committee's proposal with the State's December 17, 1988 proposal the Committee *did not* give any effect to the four percent floor on rate increases offered by Governor Sununu at the meeting. [Tr. IV—261–267]

The debtor made no counterproposal to the State with regard to a settlement on rate level increases prior to filing its plan of reorganization on December 27, 1988. The debtor rebuffed the State with regard to any further negotiations during the December 17—December 27, 1988 on the ground that it was "too busy" preparing its plan of reorganization that "had" to be filed on December 27, 1988. There of course was no requirement by any order of this court that the debtor had to file a plan of reorganization by December 27, 1988. It is true that it would under the court's prior order have the burden of justifying any further extension of its exclusivity period, and that exclusivity would have terminated on December 27, 1988 without further order. However, the record is clear that the State of New Hampshire on December 7 and December 19, 1988 assured the debtor that it would support an extension of the exclusivity deadline if negotiations on rate levels could progress. The Creditors' Committee was also "amenable" to an extension of exclusivity. [Tr. II–230]

The debtor's December 27, 1988 filed plan involves the "FERC option" and indicates a total increase in rate levels the same as the December 2nd term sheet given the State. The debtor did on December 27, 1988 address a long letter to Governor Sununu containing an argumentative discussion of the State's December 17 proposal but containing no counterproposal.

[See generally Tr. I–pp. 15, 144–151, 191, 196; III–pp. 85, 91–92, 115; IV–pp. 95–117, 121–124, 150–154, 203–204, 262 re the December 17, 1988 meeting.]

### STALEMATE—DECEMBER 27TH TO DATE

The filing of the "FERC plan" by the debtor on December 27, 1988 predictably triggered an outcry from various public officials in the State of New Hampshire decrying the attempt to "escape state regulation" by the chapter 11 plan provision. Governor Sununu left office on January 5, 1989, having received no counterproposal from the debtor nor any further contacts or negotiations toward a consensual plan. Governor Gregg on taking office made it clear that the State would not engage in further negotiations with the debtor on rate levels unless the debtor and the committees were prepared to consider some "meaningful concessions"—echoing the State's prior statement that it did not want to continue bidding against itself.

In a letter dated January 11, 1989 Smukler advised the debtor of the foregoing and in addition indicated that the State's prior offers to settle the rate level question were withdrawn—including specifically the agreement that any rate increases would be based on the rate levels in effect in September of 1988. The NHPUC separately initiated proceedings designed toward redetermining of rate levels and ECRM adjustments to rates with hearings to commence in March of 1989. That regulatory effort has been stayed temporarily by this court's preliminary injunction entered on February 16, 1989 in Adversary Proceeding No. 89–06 in this case.

Following January 11, 1989, there have been no further negotiations between the

debtor and the State, or the committees and the State, with regard to a settlement on rate levels. The debtor and the committees have met several times separately in an effort to develop a "unified approach" with regard to a rate increase counter proposal to be submitted to the State, but the fact remains that as of the time of the hearings before this court in late February and early March no further negotiations or counterproposals on rate levels have involved the State of New Hampshire.

What progress there has been in trying to narrow the range of differences on rate increases in this case since the debtor's plan filing on December 27, 1988, through the date of the exclusivity extension hearings before me, have resulted largely by virtue of efforts of Northeast Utilities to get itself into position to file a plan of reorganization as a potential acquirer (acting through one of its subsidiary companies having an undisputed proof of claim in this case in the amount of $950,000.00) once the debtor's exclusivity period for plan acceptance has terminated. Also, CCUC acting in effect as a "go-between" has developed some indications that the rate increases contemplated by the NU plan elicited a "not unfavorable" response from State representatives in further meetings between CCUC and the State, and NU and the State, which development has been reported to the other parties in interest.

The record does indicate that there has been some movement in this regard in narrowing the range of dispute as to those rates which would not exceed the "elasticity boundry" in the circumstances of this debtor and its market. However, such a quantification and determination of the "reasonable band" of economically possible rate increases is a far cry from achieving a overall *rate settlement* agreeable to all parties in interest in this proceeding. Moreover, the record indicates that the debtor and the more knowledgeable parties in interest had a pretty good idea of the elasticity band from the very outset of the case—although educating others to those facts admittedly required some time.

It is clear from the record that negotiations between the debtor and the State of New Hampshire on rate levels are at an impasse. As warned, the filing of a plan involving the attempted transfer of the regulatory jurisdiction from the state to the federal government resulted in strong public responses by the public officials of the State of New Hampshire. The salvo of "proclamation" letters fired off by each side on December 27, 1988 (the debtor) and January 11, 1989 (the state) and January 12, 1989 (the debtor) illustrate a serious questioning of each other's motives hardly conducive to productive negotiations.

The impasse between the debtor and the state is further illustrated by the vehement tone exhibited by the debtor and the State in their pleadings and pleadings relating to the injunctive proceeding in Adversary Proceeding No. 89-06 before this court in this case, together with their pleadings with regard to the exclusivity extension issue now before the court, all illustrating a severe degree of distrust and questioning of motives.

The fact is that there have been *no* meetings between the debtor and the State with regard to negotiating an agreement on rate levels since the filing of the December 27, 1988 plan of reorganization. The Debtor has concentrated instead on the meetings described above with the committees and parties other than the State in an attempt to develop a "unified position" on rate levels preparatory to coming back to the State for further negotiations. It would seem that that effort might have been more aggressively and intensively pursued prior to December of 1988 and the filing of the FERC plan of reorganization.

Considering all of the foregoing, I conclude that negotiations on rate levels supportive of a consensual plan of reorganization were not substantially advanced at the time of the hearings commencing February 22, 1989 over their status as of the plan filing on December 27, 1988. Moreover, the status of such negotiations at the time of plan filing were not in my judgment substantially advanced over the situation at

the time of the first meeting of all of the parties in interest on August 2, 1988.

## EXCLUSIVITY EXTENSION

The court set forth the applicable legal standards for exclusivity extension in detail in its June 22, 1988 decision and those standards will not be reiterated in full here. See *In re PSNH*, 88 B.R. 521 (Bankr.D.N. H.1988). The court indicated rather clearly in that decision that it would consider any requests for further extension of the debtor's exclusivity period in conjunction with a showing as to the status and progress of plan negotiations toward a consensual plan at the time of the hearings on any such requested extension. *Id.* at 537–42. I further indicated that the debtor would have the "full burden" of showing that it had done all that was possible to reach a consensual result in the time available. *Id.* at p. 542.

All parties agree that a determination with regard to rate levels for the reorganized company is fundamental to any plan of reorganization in this case.[9] It is apparent, as I have indicated above, that in the more than eight months which have elapsed since the entry of my June 22, 1988 order the debtor has not been able to cause any substantial progress in the negotiation and agreement on a determination of rate levels.

As noted in the June 22, 1988 decision, it has been held that exclusivity extensions must be "paid for" by "hard bargaining" during the period of the Debtor's exclusivity in formulating and gaining acceptance of a plan of reorganization. *In re Manville Forest Products Corp.*, 31 B.R. 991, 993 (S.D.N.Y.1983). The most noticeable fact that emerges from the present record in that regard is that during the June 22

through December 27, 1988 period there were relatively few full-bore negotiating sessions between the Debtor and the State, and only three general negotiating sessions with the Debtor, the State, and all other qualified negotiating parties present to attempt a rate level settlement. The other fact that emerges is that the debtor curiously made no counterproposals to the proposals being offered by the State relating rate levels until the term sheet given the State on December 2, 1988. The State on the contrary repeatedly indicated its willingness to address the concerns being voiced by the Debtor and the other parties by alternative features and rate level structures.

I recognize that the Debtor and the committees had many other things to do during the period in question—and doubtless had many other meetings between themselves and individual contacts with the State by the committees during this period that do not appear in the record before me. However, inasmuch as a settlement on rate levels clearly is essential to any consensual plan of reorganization I cannot find that the Debtor during that period engaged in any "hard bargaining" in any relevant sense for present purposes. It may have been hard bargaining in the sense of acceding to the position of the equity holders that the rate levels agreed upon *had* to leave some enterprise value sufficient to get down to their position. I do not believe however that it was hard bargaining in the more meaningful sense of the debtor-in-possession bargaining with *all* entities involved to forcefully and clearly demonstrate that the underlying economic realities facing this debtor, and the reorganized company emerging from these proceedings, justified that view of rate levels and enterprise values.[10]

9. Indeed the Debtor's negotiating representative testified repeatedly that the chapter 11 case was really "a rate case" and emphasized that rates were the key to reorganization. [Tr. II–227; Tr. III–78, 121, 122, 131, 133]

10. This is not to say that the equity holders may not ultimately be proven right with regard to their view on rate levels and enterprise values. It is simply to say that if a debtor-in-possession is to retain exclusive control of the formulation

of the plan of reorganization under an exclusivity period it must demonstrate that it uses its position to effectively foster consensual agreement by all entities involved. With the termination of exclusivity, the equity holders of course will have free reign to file their own plan of reorganization and make their own effort to demonstrate that enterprise value in this case does in fact justify their participation in the ultimate reorganization of this debtor.

Aside from the December 2, 1988 term sheet the debtor made *no* counterproposals to the various rate proposals being "put on the table" by the state. This seems to me a curious definition of "negotiating" the most fundamental factor essential to a consensual plan of reorganization. I am constrained to conclude that the State was correct in its ultimate assessment that the debtor was leaving the State to "bid against itself" in the ongoing meetings and discussions.

The debtor at the outset of the chapter 11 proceedings was looking for a 40 percent "bullet" one-time rate increase from the state. During the course of the year that has elapsed since the plan filing the debtor ultimately came to the realization that any rate increase above 30 or 31 percent (on a "bullet" basis) would be counterproductive. The evidence indicates that a ten percent rate increase or decrease has an approximate value to the enterprise of some $350,000,000.00.

It appears that whatever maximum rate levels may exist at a given moment, in terms of market elasticity, varies constantly as other variables going into the equation also change. If the objective is to get a determination that is final for all times and places it is obvious that such an approach will lead to endless delay in achieving a consensual plan in this case. At some point the parties in interest have to negotiate a "deal" on the basis of the best information then available.

The Debtor argues that rate proposals made by the State were not accompanied by "financial runs" with the implication being that any such offer was not seriously presented or could not appropriately be evaluated. I take this to be an irrelevant factor for my purposes inasmuch as the record also clearly establishes that no party in interest would act on any offer without making its own financial runs in its own computer model of the PSNH structure and operations. [Tr. IV–262] Moreover, the record also establishes that it is possible—as noted above that a CCUC representative actually did—to run a proposal through a computer model by a laptop computer during a lunch break and come up with a rough approximation of enterprise value effects sufficient for further negotiations.

Essentially what happened at the December 17, 1988 summit meeting in my judgment was that the governor and his minions appeared in full battle garb and marched up the hill and laid down on the field of battle a new rate proposal. The debtor and the committees, and the other parties in interest, with their phalanxes of attorneys, accountants, investment bankers, and other foot soldiers marched up the hill, looked at the proposal, and marched right back down again. The debtor argues however that the State's rate proposal at the December 17, 1988 meeting was only a "media event" and that anyway there was too little time remaining from December 17 to December 27, 1988 to give sufficient and careful study to the new proposal.

With regard to the first point made by the Debtor, the short answer as to whether the State was engaged in a "media event" on December 17, 1988 is that we will never know. Had the debtor probed the State's offer with some counterproposal—or even some inquiries—we would then know whether the State was or was not serious in negotiating some further movement toward agreement on rate levels for the reorganized company. It is difficult for me to believe that the debtor and its representatives could have seriously believed that the new rate proposal presented by the State at the outset of the December 17 meeting was in fact the State's final offer. Serious and sophisticated negotiators do not assume that their opposite party comes to a negotiating session laying down a final position at the outset of the session. The governor's gruff pronouncements at the outset of the session do not take away from this point. Public officials are used to making public pronouncements. The real point is that the debtor never probed the State's representatives as to any further flexibility on rate levels prior to determining that they would be "too busy" preparing their December 27, 1988 plan to negotiate further in that regard.

As to the latter point made by the debtor, the short answer is that this record establishes that the debtor itself did not take all actions necessary to precipitate a "final negotiating session" with the State long before December 17, 1988. The record establishes, as indicated above, that the debtor pretty well had settled upon its FERC-plan option as early as the December 6, 1988 meeting with the committees. It accordingly rings a little hollow to protest that the State gave it a new proposal on December 17, 1988 too late for serious evaluation or further negotiations.

The Creditors' Committee, CCUC, and Northeast Utilities all indicated during the course of the hearings, through witnesses and otherwise, that they have alternative plans "ready to file" in their file drawers (or more accurately in the memory of their word processors) which they will call up for filing once exclusivity is ended. The debtor notes correctly that none of these parties have disclosed their plans of reorganization to the debtor or the other parties in interest. To some extent this reluctance is explained by the concern with being charged with improper "solicitation" under § 1121 and 1125 of the Bankruptcy Code of other plans during the period of the debtor's exclusivity under some early case law. But see *Kirk v. Texaco, Inc.*, 82 B.R. 678, 18 C.B.C.2d 331 (S.D.N.Y.1988); *Century Glove, Inc. v. First American Bank*, 860 F.2d 94, 18 B.C.D. 747 (3rd Cir.1988). Furthermore, it is true as the debtor suggests that until the actual details of a plan are disclosed, with all the necessary work to create that structure and accompanying disclosure statement provisions, it is not really possible to evaluate whether a "plan" bruited about in argument is truly a substantial confirmable plan "waiting in the wings" until termination of exclusivity.[11]

Notwithstanding the lack of specific details as to the alternative plans that may be filed in this case, the record does establish that the plan proponents are sophisticated and substantial parties who are fully aware of the cost and expense of presenting a plan of reorganization in a complex chapter 11 proceeding. They have in fact incurred those expenses and there is no reason to believe that they do not seriously intend to present alternative plans in this proceeding when permitted to do so. Moreover, enough of the major provisions of the alternative plans have been discussed during the course of the hearings to indicate that the alternative plans being held up by exclusivity are in fact serious attempts to achieve a confirmable plan of reorganization within a relatively short timeframe in these proceedings. Indeed, as indicated above, the *only* recent movement toward an agreement on rate levels with the State of New Hampshire has come by virtue of the activity of the alternative plan proponents.

Considering the entire state of the record as of the date of the exclusivity hearings that commenced on February 22, 1989, and the specific matters highlighted in this opinion, I conclude that the debtor has not shown cause for a further extension of exclusivity to secure acceptance of its plan of reorganization filed December 27, 1988. For one thing, the debtor itself indicates that that plan was not filed as a prelude to consensual acceptance, but only as a last resort in the event that further negotiations do not produce a consensual plan. More importantly, the stalemate between the debtor and the State of New Hampshire on rate levels, and the history of the negotiations following my prior exclusivity extension order of June 22, 1988, leave me with the view that further extension of exclusivity will *not* promote a consensual plan of reorganization within a reasonable

---

11. The court is reminded in this regard of the words Shakespeare put in the mouths of Glendower and Hotspur regarding "calling Spirits from the vasty Deep" in the play, King Henry IV, part I, act III, scene I, lines 53–55. Those words have served judges in good stead to cut to the heart of matters. See, *Johnson v. Transportation Agency*, 480 U.S. 616, 107 S.Ct. 1442, 1474, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting). In the present case I would be bold to paraphrase Shakespeare slightly:

GLENDOWER: "I can call Plans forth from the vasty Deep of my computer's memory bank."

HOTSPUR: "Why, so can I, or so can any man. But will they come—and be confirmed—when you do call for them?"

timeframe. The court also must consider the substantial administrative costs and delay costs being incurred as these proceedings drag on. I believe the time has come to return the parties to a "level playing field" as envisioned by Congress under the provisions of § 1121 of the Bankruptcy Code to occur at some state in even a complex reorganization proceeding. Indeed, I believe that the level playing field is *essential* in the present circumstances of *this case* to foster a consensual plan.[12]

The reason why a return to the "level playing field" is particularly apt in this stage of this case stems from another factor unique to this case, i.e., the circular questions relating to the valuation of a regulated monopoly utility company and the setting of rate levels for that company. If I have learned nothing else from the course of these chapter 11 proceedings, and the hearings on exclusivity extension commenced on February 22, 1989, it is that the setting of rates by a public utility commission for a utility company is no more an exact science than is the valuation of a debtor in reorganization by a federal reorganization court.

With regard to the former, there are political considerations that necessarily must be taken into account in the rate setting process when dealing with the regulated monopoly serving the public in the affected state.[13] With regard to the latter, every experienced reorganization professional recognizes that there is much discretion and uncertainty involved in a court determination of value. A negotiated settlement on value by knowledgeable professionals is much to be preferred to litigation in the reorganization court. Given these realities, and considering what I believe to be the debtor's over-reaction to the "politi-

cal" aspects of the state's responses, I believe that a further extension of exclusivity would only result in the parties continuing to argue in circles endlessly on the various issues and questions in this case. On the contrary, opening up the process to alternative plans in my judgment will serve to quantify and make concrete various ways of resolving those circular questions. I believe it will force the parties to use all of their considerable skills to negotiate resolutions on a fact basis (rather than and ideological basis dealing with unanswered and unanswerable interesting legal questions) under the gun of having the "reorganization train leave the station" before they are aboard.

## THE "CHAOS" FACTOR

Even though the court has concluded that opening up the plan formulation process to alternative plans is appropriate in the present circumstances of this case, some attention should be paid to the debtor's constant argument that that very opening up of the process will result in "chaos" by virtue of an expectable filing of some six or seven plans in this case that it expects to result. I have dealt with the "chaos" or "free fall" contention to some extent in my June 22, 1988 opinion. See, *In re PSNH*, 88 B.R. 521, 538–40 (Bankr.D. N.H.1988). However, it is one thing to deal with that contingency on a hypothetical basis; it is another thing entirely to face it as an actuality as this court must now do.

It may well be in many chapter 11 reorganization proceedings it would unwise—and even lead to uncontrollable confusion and delay—to permit multiple plan filings. Congress of course decided otherwise as a general rule by virtue of its explicit recog-

12. The debtor in its memorandums and argument on exclusivity extension has focused on a "realistic possibility" of a consensual plan that it believes is the appropriate standard for exclusivity extension rather than those standards set forth in my June 22, 1988 opinion. I disagree with the debtor in that regard, inasmuch as I believe that such a standard is much too loose to do anything other than to assure a debtor in reorganization exclusivity throughout the reorganization proceedings involving a complex reorganization. The important point, however,

even if the "realistic possibility" is assumed to be the appropriate standard, is where that realistic possibility of a consensual plan comes from. In this case I do believe there is still a realistic possibility of a consensual plan—but not if the debtor retains exclusive control of plan formulation.

13. I do not use "political" here in any perjorative sense.

nition of the prospect of multiple plan filings. See *Bankruptcy Code* §§ 1121(c); 1129(c). In the normal chapter 11 case—indeed in *every* reorganization prior to the present case—the parties in interest deal with the reorganization in terms of negotiations in which no one party in interest has an independent position by which it may increase or decrease the enterprise value of the company in reorganization. In the present case, for the first time, one of the parties in interest, i.e., the State of New Hampshire, arguably *does* have that power by virtue of its regulatory statutes relating to this utility and the powers of the NHPUC, as well as the specific provision of § 1129(a)(6) of the Bankruptcy Code.

Until and if that arguable power of the State of New Hampshire is determined not to exist, the State of New Hampshire in my judgment will serve in effect as a "balance wheel" that will prevent the "engine" of a consensual reorganization from flying to pieces notwithstanding the filing of multiple plans of reorganization.

Short of proceeding to immediate all-out war with the State of New Hampshire, each new plan proponent necessarily will have to negotiate with the State and the other constituencies in this case as to rate levels for the reorganized company. That process will take time and will in effect create a period during which further negotiations toward a consensual plan will go forward notwithstanding the termination of the debtor's exclusivity period.

Moreover, and to change the metaphor for the movement, there is in fact a "natural brake" in this case by virtue of the very complexity involved in the regulatory and rate level matters that will take some time to structure into a plan and cover in a court-approved disclosure statement pursuant to § 1125 of the Code to support any plan seriously presented and pursued in this case. That "natural brake" will serve in my judgment to prevent these proceedings from immediately sliding off the ledge into a black abyss of litigation notwithstanding multiple plan filings.

Finally, in this court's order implementing its decision to terminate exclusivity and permit multiple plan filings, as well as in its separate order dealing with the appointment of an examiner in this case, the court is including specific additional provisions and protections to assure that the necessary timeframe for further negotiations toward a consensual plan, and development of adequate disclosure statements is preserved.

For all of foregoing reasons set forth in this Opinion I believe that the debtor has not shown cause under § 1121(d) for a further extension of exclusivity and a separate order accordingly will be entered denying the pending motion.