**In re DOW CORNING CORPORATION,**
**Debtor.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

May 27, 1997.

Barbara J. Houser and George H. Tarpley, Dallas, TX, for Debtor in Possession.

Kenneth H. Eckstein, New York City, for Official Committee of Tort Claimants.

Ogden N. Lewis, New York City, for Official Committee of Unsecured Creditors.

H. Jeffrey Schwartz, Cleveland, OH, for the Official Physicians Committee.

James L. Stengel, New York City, for Dow Chemical Co.

William D. Eggers, for Corning, Inc.

Lawrence J. Nyhan and James F. Conlan, Chicago, IL, for Baxter Healthcare Corp.

### OPINION ON THE MOTION TO MODIFY EXCLUSIVITY

ARTHUR J. SPECTOR, Bankruptcy Judge.

This is a contested matter as described in F.R.Bankr.P. 9014. It is within the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1334 and 157(a) and is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

On January 10, 1997, the Official Committees of Unsecured Creditors and of Tort Claimants ("Committees") filed a joint motion entitled "Motion for Order Modifying Exclusivity ...," in which, pursuant to § 1121(d) of the Bankruptcy Code, they seek an order terminating the Debtor's exclusive periods, and permitting only them to file a competing plan. The Court previously granted the Debtor extensions on its exclusivity periods on two occasions, most recently on May 16, 1996. The May 16, 1996, order extended the Debtor's exclusive period to file a plan until 21 days after the Court ruled on

the competing estimation motions and also extended the Debtor's exclusivity period to seek acceptances to that plan "until further order of the Court." On December 2, 1996, the Debtor filed a plan and disclosure statement, though no progress toward confirming that plan or approving the disclosure statement has been attempted.

■ As a general rule, the party seeking to terminate or modify a debtor's exclusivity period bears the burden of proof since it is the moving party who seeks to change the status quo. Consequently, it would seem safe to conclude that the Committees possessed the burden of proof on their motion. And since most cases state that the standard of proof for such motions is a heavy one, Dow Chemical's argument that the Committees bear a heavy burden to prove their case sounds right. But those cases are not like this one.

For one thing, the law also states that a debtor bears the burden of proof when it requests an extension of its period of exclusivity. Many cases say this, including a still-respected precedent from this district, *In re Lake in the Woods,* 10 B.R. 338 (E.D.Mich. 1981); *see also, In re Homestead Partners, Ltd.,* 197 B.R. 706 (Bankr.N.D.Ga.1996). But it is more direct to simply cite the statute. A debtor can obtain an extension only if it can show "cause." 11 U.S.C. § 1121(d). So, in light of the somewhat open-ended nature of the Debtor's period of exclusivity, it would also be fair to say that the Debtor bears the burden to continue the extension.

These competing burdens tend to balance out under the present circumstances. If the proofs were such that making the decision without reference to a burden of proof were possible, we would do just that. But, at least with respect to some issues, the evidence is near equipoise; accordingly, assignment of the burden of proof is more than academic under these circumstances.

The most compelling logic to help us escape from the conundrum was offered by Mr. Eggers, speaking on behalf of Corning, Inc. He analogized the Committees' motion to one for rehearing. Pursuant to F.R.Civ.P. 59, incorporated into bankruptcy jurisprudence by F.R.Bankr.P. 9023, a new trial or rehear-

ing may be granted to a party upon a showing which satisfies "any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States." A hearing on such a motion may include "additional testimony" and may result in amended or even new findings of fact and conclusions of law. F.R.Civ.P. 59(a). The deadline for filing such a motion is usually 10 days from the entry of the judgment and here the order extending exclusivity was entered a year ago, about eight months before the Committees filed their motion.

However, F.R.Bankr.P. 9024, which incorporates F.R.Civ.P. 60, has no such deadline. Pursuant to Rule 60(b)(6), a party may seek relief from a final judgment upon a showing of any reason which justifies relief. When the final judgment is one which is based in equity and which has a continuing effect on the parties, courts have been willing to modify their decrees if the changing circumstances so warrant. *Rufo v. Inmates of Suffolk County,* 502 U.S. 367, 380, 112 S.Ct. 748, 758, 116 L.Ed.2d 867 (1992) ("There is ... no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.")

Generally, the standard of proof for a motion under Rule 60(b)(6) is quite high. In *United States v. Swift,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), the Court said: "Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed...." Indeed, the Sixth Circuit has held that courts should only apply Rule 60(b)(6) "as a means to achieve substantial justice when 'something more' than one of the grounds contained in Rule 60(b)'s first five clauses is present." *Olle v. Henry & Wright Corp.,* 910 F.2d 357, 365 (6th Cir. 1990) (quoting *Hopper v. Euclid Manor Nursing Home, Inc.,* 867 F.2d 291, 294 (6th Cir.1989)). Since the first five enumerated clauses of Rule 60(b) cover almost every conceivable ground for relief, the "'something more'... must include unusual and extreme situations where principles of equity

mandate relief." *Olle,* 910 F.2d at 365. In other words, Rule 60(b)(6) should only be invoked in "exceptional or extraordinary circumstances." *Id.; see also* 7 *Moore's Federal Practice,* ¶ 60.27 at 60–274 (Clause (6) "is intended to be a means for accomplishing justice in exceptional situations. . . .").

Mr. Eggers' argument is persuasive. Because the Court examined the equities last May when it decided that the Debtor should be allowed an extension of exclusivity for 21 days after the Court rules on the competing estimation motions and an indeterminate period thereafter to obtain acceptance of the plan, the Committees bear the burden of establishing sufficiently changed circumstances which warrant relief from that order. Accordingly, the burden of proof is assigned to the Committees.

■■■ However, under the circumstances of this contested matter, where the Code itself delimits the periods of a debtor's exclusivity generally to 120 days, and 180 days respectively, *see* 11 U.S.C. § 1121(b), (c)(3), it would be unfair to demand that the Committees meet a heightened burden. *See In re Durkalec,* 21 B.R. 618, 620 (Bankr.E.D.Pa. 1982) (stating that the bankruptcy court has "the power to vacate a final judgment" and "may exercise this power very liberally."). *See also Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) ("Because the preponderance of the evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants, unless 'particularly important individual interests or rights are at stake.' "). In this Court's opinion, the Debtor's burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts; and a creditor's burden to terminate gets lighter with the passage of time. *Cf. In re Holly's, Inc.,* 140 B.R. 643 (Bankr.W.D.Mich.1992) (applying this sliding scale in the context of a debtor's showing that there is a reasonable likelihood of a reorganization to defend against a secured creditor's motion to terminate the automatic stay). Accordingly, we conclude that at the recently concluded hearing, the Committees bore the burden of showing by a preponderance of the evidence that something has changed to justify altering that determination.

■■■ On behalf of Corning, Inc., Mr. Eggers argued that the Committees have failed to show any cause for changing last May's order. When the Court last considered this issue, it was the Debtor that carried and satisfied the burden of showing cause as to why the period of exclusivity should be further extended. One thing has most assuredly changed over the past year—and that is, a lot of time has passed. That fact is of significance because time is something that claimants cannot have back. Furthermore, the more time which has elapsed, the more opportunity there should have been to resolve the parties' differences and to reach consensus. So passage of time is a changed circumstance. However, it is not sufficient in and of itself to be cause to terminate exclusivity.

■■■ Fortunately, courts have distilled certain factors to consider when tasked with deciding whether to on the one hand, extend, or on the other, terminate, a debtor's statutory period of exclusivity. While not all courts agree on the precise formulation, most rely on the same factors. For the purposes here, we will use the factors as stated by the court in *In re Express One Int'l, Inc.,* 194 B.R. 98, 100 (Bankr.E.D.Tex.1996), with the exception that the seventh factor, being essentially the same as the second, will not be addressed. That court listed the following nine factors:

1.  the size and complexity of the case;
2.  the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
3.  the existence of good faith progress toward reorganization;
4.  the fact that the debtor is paying its bills as they become due;
5.  whether the debtor has demonstrated reasonable prospects for filing a viable plan;
6.  whether the debtor has made progress in negotiations with its creditors;
7.  the amount of time which has elapsed in the case;

8.  whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

9.  whether an unresolved contingency exists.

All parties agree that these are the relevant factors to be considered.

The first factor is decidedly favorable to the continuation of exclusivity. This case is unique in its size and complexity as even the Sixth Circuit has noted. *In re Dow Corning Corp.*, 86 F.3d 482, 486 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 718, 136 L.Ed.2d 636 (1997).

The second factor—the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and to prepare adequate information—is a closer question. The Debtor has had two years to negotiate a plan of reorganization and to prepare adequate information. Two years is clearly a long time. On the other hand, so much of that time has been spent in litigation or in awaiting results of litigation that the period for pure negotiating has not been nearly as long. And all parties admit that the Debtor has prepared and provided adequate information to the various constituencies on the timetable it promised early in this case. Nevertheless, the Debtor has had sufficient time to negotiate a plan if it and the other parties had a mind to put the wars behind them. This factor predominates ever so slightly toward granting the Committees' motion.

The evidence was fairly clear that the Debtor has made good faith progress toward reorganization even if such progress has not been enough to satisfy the Court or the Committees. In previous hearings on exclusivity the Debtor, through its witness, Arthur B. Newman, laid out the game plan and a timetable for progress towards reorganization in this case. For the most part, the Debtor has met those deadlines. The delays encountered along the way are nearly all the fault of the judiciary, myself included. Although many parties tend to suffer in some way from judicial delay, no party should be made to suffer legal prejudice for delays such as these, which are out of the party's control.

After the informational part of the Debtor's duties was accomplished, the Debtor commenced negotiating in good faith with its commercial creditors. In short order, it settled the commercial issues with the Unsecured Creditors Committee. It then turned its attention to the Tort Claimants Committee. Not surprisingly, because the issues there are so intractable, and because the parties have to first fight through a miasma of hard feelings, those talks have gone ever so slowly. In fact, there has been precious little, if any, real progress on the points which separate them. Yet some progress towards reorganization has been made and we are unquestionably further along than when we started. Therefore, Factor # 3 slightly (because the progress itself was so slight) favors denying the motion.

The fourth factor clearly is favorable to the Debtor's retaining exclusivity since it is paying its bills on time and is extraordinarily sound financially.

The Debtor has already filed what it calls a plan. Of course, it acknowledges that the document is not a plan which it intends to pursue to confirmation. So, for these purposes, let us be realistic and ignore it. Has the Debtor demonstrated that it has reasonable prospects for filing a viable plan? No, it really has not. But in this contested matter, the Committees bore the burden of showing that the Debtor lacks any realistic prospect of proposing a viable plan. And in this case everybody knows that the prospects of attaining confirmation of some viable plan are excellent. A company of this size and evident success will not simply be thrown away. If the Debtor bore the burden of proof, we would hold that the mere fact that there WILL be a plan confirmed in this case is insufficient to satisfy Factor # 5. But since the burden was on the Committees, their failure to address evidence to the Debtor's inability to propose a viable plan means that this factor cannot be counted on either side of the ledger.

The sixth and eighth factors are where the real fight was. We will come back to them later.

The ninth factor—whether an unresolved contingency exists—is the subject of word games by the parties. The Debtor asserts that this Court's failure to answer the question of how claims will be estimated and/or liquidated is itself an unresolved contingency which has stymied further progress in the case. Because the Court expressly tied the period of the Debtor's exclusive right to file a plan to the decision on the motions for estimation, it is entirely appropriate that the Debtor believes the resolution of this crucial issue is such an unresolved contingency. The Court, however, accepts the Committees' interpretation of this factor and rejects the notion that the lengthy delay in the Court's ruling on the contested estimation motions is the type of unresolved contingency which is meant to excuse a debtor from serious plan negotiations. In our view, generally, the type of unresolved contingency which would be relevant to a motion to extend or to terminate exclusivity is one which is external to the case itself.

In *In re Trainer's, Inc.,* 17 B.R. 246 (Bankr.E.D.Pa.1982), the court held that the debtor's negotiations to sell its main asset, a restaurant, as a going concern, was a contingency which warranted a short extension, although for other reasons the extension was denied. In *In re Swatara Coal Co.,* 49 B.R. 898 (Bankr.E.D.Pa.1985), another judge of that court granted the debtor a short extension of exclusivity to complete negotiations for a business arrangement with outsiders which was "central to the operation of the debtor's business." *Id.* at 899–900. If the negotiations turned out to be successful, it "would likely enable the debtor to file a viable reorganization plan and to rehabilitate itself as an ongoing business concern." *Id.* at 900. A stipulation which laid the groundwork for these negotiations contained a deadline, so that if the negotiations were not completed within less than 60 days of the date of the court's opinion, the deal was off. The court concluded that the successful completion of negotiations for a business relationship was an unresolved contingency with a short finite deadline which justified a brief extension of exclusivity.

In contrast with these two Philadelphia cases, which held that negotiation with an outsider over a business transaction, the result of which would have dictated the outcome of the bankruptcy case, is an unresolved contingency which justifies an extension of exclusivity, there is our own local case of *In re Lake in the Woods, supra.* District judge, now Chief District Judge, Anna Diggs Taylor, reversed the bankruptcy court's grant of an indefinite extension of the debtor's exclusive periods until it had ruled on a title dispute between the debtor and its principal adversary in the bankruptcy case. 10 B.R. at 345. The district court explained the futility of this type of extension, saying: "Once the title dispute has been resolved by the bankruptcy court, a dissatisfied party will be free to appeal the ruling and further prolong the reorganization proceedings." *Id.* at 345. The court plainly felt that this type of contingency—the result of a bankruptcy court litigation between the principal adversaries in the bankruptcy case—was not the kind of unresolved contingency which would justify the extension of the debtor's periods of exclusivity. It said: "the existence of a dispute between the debtor and creditor over title to real estate does not constitute cause to extend the exclusive period." *Id.* A further factor, which serves to distinguish *Lake in the Woods* from this case, however, is that the court found that the debtor maintained a "take it or leave it attitude," refusing to budge until its adversary conceded title to the debtor. *Id.* The court explained that "extensions are impermissible if they are for the purpose of allowing the debtor to prolong reorganization while pressuring a creditor to accede to its point of view on an issue in dispute." *Id.* at 345–46. And it concluded that "the bankruptcy court's finding in this case has precisely this impermissible effect." *Id.* at 346. Since, as discussed in greater detail, *infra* p. 668–69, we conclude that the Debtor in this case has not expressed a take it or leave it attitude nor attempted to pressure its creditors to accede to its point of view, the ultimate holding in

*Lake in the Woods* is distinguishable. However, the holding that litigation within the bankruptcy court over even a key dispute between the parties is not the type of contingency which justifies extension of exclusivity is not distinguishable.

To like effect is the case which was most frequently cited by the parties, *In re Public Service Co. of New Hampshire,* 99 B.R. 155 (Bankr.D.N.H.1989). There the court agreed that the determination of utility rates was the central issue in the case. Yet the parties' negotiations over that issue was held not to be a contingency which warranted further extending the debtor's exclusivity.

Though all parties have dubbed the outcome of those motions crucial to this case, a decision on what procedures a court will use to liquidate and/or estimate claims within the bankruptcy case itself is more or less a risk of doing business in bankruptcy. It is, in essence, a part of the negotiating atmosphere in mass tort cases and should not be a reason for negotiations to stall. This is not to say that the parties would not have been assisted if they knew precisely whether either of their motions for estimation would be granted, and if not, what other procedure(s) the Court contemplated. However, to take that argument to its logical extreme, the parties would be even more greatly assisted if the District Court had already fully liquidated all claims. With that accomplished, the Debtor could much more easily conceive of and negotiate a plan of reorganization. Therefore, the Court agrees with the Committees that "[e]ither this dispute itself [i.e., the amount of tort liability which the Debtor must provide for] or procedures for resolving this dispute is susceptible of a negotiated resolution." Post–Trial Memorandum of the Unsecured Creditors' and Tort Claimants' Committees in Support of Joint Motion to Modify Exclusivity ..., p. 3. The Debtor chose not to truly negotiate its resolution but to let the Court decide it. We conclude that there was no unresolved contingency which would have interfered with the Debtor's negotiating a plan with the Committees. This factor, therefore, favors the Committees.

This brings us back to factors six and eight—whether the debtor has made progress in negotiations with its creditors, and whether the debtor has been using its exclusivity to pressure creditors to submit to its reorganization demands. You know those pictures that, when you look at them from one angle they appear one way, but if you stare at them from another they look like something else? That's how the proofs received in this contested matter appear. The parties have no real disagreement on the evidence. In effect, they have jointly painted the canvas for the Court. But each side sees a different picture inside the frame. And an impartial observer can see one picture when looking at it from one angle and a different picture when looking at it from another.

The sixth factor—whether the debtor has made progress in negotiations with its creditors—points towards granting the motion. The Committees make a compelling case that the Debtor has been stalling until this Court ruled on the competing estimation motions, and the Debtor's motions for the appointment of a science panel and a common-issue trial. As the Committees paint the picture, since the Debtor is making money hand over fist, delay is its friend. And, given the continuing tide of good news from other courts handling breast implant cases nationally, the Debtor has undoubtedly been happy to sit tight, calculating that eventually the weight of scientific evidence developing outside of this case would rescue it from what it perceives as its greedy and unreasonable tort creditors. Therefore, it embarked upon stalling tactics—going through the motions of negotiating a compromise, but giving up nothing in the process. As a result, it could make a show of seeking consensus without making the slightest effort toward that end. We do not wish here to summarize the substantial evidence which supports this picture because Mr. Eckstein did such a magnificent job doing so in his closing arguments. Nevertheless, suffice it to say that there was strong evidence to support this view of the case.

On the other hand, the Debtor makes a compelling case for the opposite conclusion. The Debtor points proudly to its having reached agreement with the commercial creditors in the first half of 1996. It also

produced the agendas for a series of meetings that took place with the Tort Claimants' Committee to show that they are making progress of a sort. The Debtor asserts that it has made progress with that Committee in the sense that it and the Committee now have an agreement on what it would take for the Debtor to achieve what it calls "closure" on the breast implant litigation.

But the Committees correctly counter that that is precious little progress of any substantive nature. They deride the negotiating efforts of the Debtor as "largely ... going through the motions, creating a record of meetings (not *bona fide* give and take) for litigation purposes, all the while waiting for the Court's estimation procedures ruling." *Id.* While there were meetings, there was no "hard bargaining." *Id.*

The Debtor's response was largely to make the Tort Claimants' Committee out to be the bogeyman. From its frame of reference, of course, the Debtor might very well believe that it was anxious to deal; that the tort claimants were belligerent and unreasonable; and that it was the Committees who were setting litigation traps for the Debtor. Most certainly, Exhibit D–8B, the September 30, 1996 Watch List Report confession that "the objective of the agreement (between the Committees) in principal (sic) on the terms of a joint [plan of reorganization] is to put pressure on [the Debtor] to begin serious negotiations with the [Tort Claimants' Committee] toward a consensual [plan of reorganization] under the realistic threat of a joint motion for the termination of exclusivity for purposes of a cramdown," supports this perspective.

All of the mini-summations and closing arguments were powerful and extremely persuasive. The picture painted by the Committees, however, comports more closely with this Court's experience and is more consistent with human nature. In particular, and notwithstanding stray comments by Sybil Goldrich to the contrary, we reject the notion that the sudden injection of the claims traders had a material influence on the Unsecured Creditors' Committee's decision to throw in with the tort claimants. And, although the stated positions of the Tort Claimants' Committee may not have moderated in public, the Court is impressed that the Committee offered two new proposals in meetings a couple of months ago. We are also impressed by the exchange of letters between David Bernick for the Debtor and Mr. Eckstein for the Tort Claimants' Committee last August. Exhibits C–73 and 74. Although they don't evidence negotiation in the horse-trading sense, they do exhibit a firm grasp on the issues and a willingness to discuss them in depth. Notwithstanding that Committee's public posturing, the fact that it found a middle ground of some sort upon which to stand with the commercial creditors leads us to believe that all hope is not lost and that with some more flexibility on both sides, a deal can be reached. *Compare Public Service Co. of New Hampshire*, 99 B.R. at 174 ("Serious and sophisticated negotiators do not assume that their opposite party comes to a negotiating session laying down a final position at the outset of the session.") While the pictures painted by both parties make sense, the likelier conclusion is that the Debtor has not made sufficient progress in negotiations with the tort claimants and that it bears a good share of the blame. We conclude that the sixth factor supports the motion.

Despite this conclusion, there simply was no evidence of any pressure on the creditors to submit to the Debtor's demands. The Debtor has been willing, albeit grudgingly, to discuss alternative methods of achieving reorganization.

Several particles of evidence support the Debtors' claim that it has demonstrated its willingness to compromise, at least to some extent. One such particle is the evidence, including the testimony of Tommy Jacks and Mr. Newman, that in the fall of last year, the Debtor suggested that it and the Tort Claimants' Committee try to agree upon disease categories. Grids have been used successfully in several mass tort cases, including the aborted Global Settlement in the Silicone Gel Breast Implant Multidistrict Litigation in Birmingham, Alabama. Although Mr. Jacks, who was a credible witness, at first described this issue as "peripheral," he ultimately agreed that it was important. Discussions

about disease categorization continued into at least the first of the three-party negotiating sessions held early this year.

A second particle of evidence was Mr. Newman's testimony about a new proposal the Debtor offered at another tri-party meeting. Due, however, to the parties' understandable skittishness over revealing the substance of their talks, the Court is unable to say with confidence which is the more accurate: Mr. Newman's characterization of the proposition's importance and freshness; or its summary dismissal by Mr. Jacks as not much different from the Debtor's October 1, 1996 proposal. But given Mr. Jacks' original attitude about the disease categorization discussions, we are inclined to believe that something fresh was suggested. This view is corroborated by the unrebutted evidence that the Tort Claimants' Committee made a request of the Debtor to put its new proposal in writing and to include numbers. If the proposal was just a rehash of a four-month old idea, the Committee would not likely have requested such follow-up efforts. The fact that at the next meeting the Debtor did present a written proposal containing its numbers is another particle of evidence tending to establish the Debtor's bona fides.

Finally, the Committees' own evidence also lends some support to the Debtor's view of its efforts. Exhibits C–73 and 74 evidence an extraordinarily thorough and deep understanding of the various avenues to achieving confirmation of a plan which would solve the difficult problems in this case. Exhibit C–73 was Mr. Bernick's letter on behalf of the Debtor, dated August 20, 1996, to certain of the negotiators for the tort claimants, which examined recent precedent to support the Debtor's view of where this case should be heading. Exhibit C–74 was Mr. Eckstein's August 30, 1996 return letter which was even more impressive in its grasp of the issues and in expressing what the tort claimants viewed as the major difficulties with the Debtor's vision.

While the Debtor could have undoubtedly done more, tried harder, been more flexible, etc., to coin a phrase, it takes two to tango. The failure to achieve a settlement on either the amount of the tort liability or the method to determine it cannot fairly be laid solely at the Debtor's door. Therefore, the Court concludes that the eighth factor listed above predominates in favor of the Debtor.

If one merely toted up the factors one would find that three factors (numbers 2, 6 and 9) support granting the motion; four factors (numbers 1, 3, 4 and 8) support denying the motion; and two factors (numbers 5 and 7) are either in equipoise or are subsumed in one of the other factors. So it would seem that the Debtor prevails. But when a court considers a laundry list of factors in the course of deciding a matter, it is not limited to the elementary task of counting the factors. Sometimes one or more factors strongly point to a particular result while others point the other way only weakly. And sometimes certain factors are just more relevant or important than others. *See In re Dow Corning Corp.*, 192 B.R. 415, 424 (Bankr.E.D.Mich.1996) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229–30 (6th Cir.1985)).

Here, there is another factor, which Judge Yacos derided as the "chaos factor" in *In re Public Service Co. of New Hampshire,* 88 B.R. 521, 538–40 (Bankr.D.N.H.1988). This view, albeit without the melodramatic overlay used by the debtor in that case, was supported by Mr. Newman's testimony. As Ms. Houser for the Debtor repeatedly stated, Mr. Newman was the only witness who had any bankruptcy reorganization experience, and what experience he has had!

A better way to look at this additional issue is to draw back from the narrow focus on individual factors and scan the big picture. After doing this, we find ourselves in agreement with the testimony of Mr. Newman and the argument by Mr. Nyhan on behalf of Baxter Healthcare Corp. They forcefully argued that at some point this Court and probably others will be called upon to say whether the Debtor's proposal for dealing with the tort claims will be acceptable. In Mr. Nyhan's words, "[t]erminating exclusivity so that the Committees can attempt to cram down their plan on the Debtor—a plan whose estimation protocol will likely conflict with this Court's forthcoming ruling—is simply a prescription for

purposeless litigation." Post Hearing Submission in Support of Dow Corning Corporation's Continued Exclusivity, p. 4. It would be foolish for the Court to hold its cards so close to the vest that the parties spend thousands of hours and millions of dollars in filing competing plans, obtaining approvals of disclosure statements, mailing out the plans to hundreds of thousands of claimants, only to have the whole thing crash in flames when the Court perhaps denies confirmation of both plans for the reasons the Court has been asked to explain right now. That is why the Court has released to the parties a draft of its opinion on estimation, which includes concepts of how allowance of claims might be handled. The draft opinion disapproves of parts of the Debtor's plan as we now know it and gives advance warning to the Committees, as well, as to the types of claims liquidation proposals which would not be acceptable. Given those parameters and instructions, the parties might be able to commence negotiations anew. Extreme positions will likely drop from among the list of options they will consider. Hopefully, at least in this fashion, the opinion will serve to focus them.

▮ When the Court is determining whether to terminate a debtor's exclusivity, the primary consideration should be whether or not doing so would facilitate moving the case forward. And that is a practical call that can override a mere toting up of the factors. In this case, that overriding factor weighs heavily against granting the motion. Accordingly, the Court will enter an order denying the Committees' motion to terminate, or as they described it, modify exclusivity under 11 U.S.C. § 1121(d).

However, the Committees will not be turned away without some modicum of relief. The Debtor filed a plan of reorganization on December 2, 1996. It therefore argues that the Court's extension of the Debtor's § 1121(b) exclusive period to file a plan is now moot. The Court cannot agree. We have told debtors of lesser means, when a deadline for filing a plan is fixed, that the Court expects the plan that is filed to be a real plan and not just an excuse to escape dismissal for lack of progress. Similarly, when exclusivity is extended, we expect that the plan which is filed will be one intended to be used to exit chapter 11, and not as a placeholder to delay further progress in the case. Yet the Debtor, through its counsel's comments and Mr. Newman's testimony, admitted that the December 2nd plan was not filed for the purpose of proceeding to confirmation, but merely as a tactic. Accordingly, if it were within our power and good sense to do so, we would simply strike the plan from the record. We will not actually do this though. Instead, the Court will again follow the suggestion of Mr. Nyhan, see Post Hearing Submission in Support of Dow Corning Corporation's Continued Exclusivity, p. 4 ("Baxter reiterates its position that the Debtor should retain exclusivity for a reasonable period of time after this Court has decided the pending estimation motions.") and will enter a new order granting the Debtor 21 days from the date an order disposing of the estimation motions is entered within which to file a plan. However, to put some teeth into it, this time the order will provide that if the Debtor fails to timely file a new plan, the Debtor's § 1121(c)(3) exclusive period to gain acceptances of its December 2, 1996 plan will be terminated.[1]

An order consistent with this Opinion will be entered shortly.

---

1. Now that the parties are about to receive the Court's opinions on the estimations and other pending motions, we expect them to re-enter constructive and productive negotiations. Should circumstances warrant it, the Court reserves the right to appoint a mediator to assist the parties in coming to a negotiated resolution.